Wood, C. J.
Before we proceed to what is conceived to be the main question, we will dispose of the case in another aspect in which it is presented by the counsel for the respondents, but in *647 which it is entirely unsustained by any legal evidence. It is said Mrs. Stilley elected to take under the will of her husband; and testimony has been taken to show that, immediately after the death of Polger, she received the most of the personal property -devised to her by the will, and enumerated in the schedule; but; the evidence proves she, at the same time, declared her intention not to be excluded by the will, from claiming dower in the lands of her deceased husband. As the will was doubtless designed by the testator to carry out, in good faith, on his part, the covenants contained in this antenuptial agreement, and is substantially the same, her acts, after the death of her husband, in the reception of the property, may be competent evidence to prove a con firmation of the covenants; but are not, we think, competent for any other purpose.
The statute enacts, “If any provision be made for a widow, in the will of her husband, she shall, within six months after probate •of the will, make her election, whether she will take such provision orbe endowed of his lands; but she shall not be entitled to both, unless it plainly appears by the will to have been the intention of the testator that she should have such provision, in addition to her dower.” It is also provided that the election of the widow to take under the will, shall be made known to the court ■of common pleas for the proper county, which shall be entered on the minutes of said court; and if the *widow fail to make such election, she shall retain her dower. Swan’s Stat. 998, secs. 46, 47.
The property mentioned in the agreement, and devised by the will, was received by Mrs. Folger within the time limited to make an election. This is not denied. It was in fact taken very soon after the dissolution of her husband, and in hot haste, though the evidence leaves the fact perfectly clear that his eyes were fully closed before she either seized the property or even announced her intention to break the will. Such an act, however, is not an election, nor can it be proved in this way. An election must be made known to the court of common pleas of the proper county, .and the record, unless lost or destroyed, is the only evidence by which it can be established; because it is the best proof of which the nature of the case admits.
Had Mrs. Stilley elected to take under the will, there would be *648 the end of the complainant’s case; for it is manifest the provisions of the will were designed to bar her dower, as well as the agreement, and in terms the most clear and explicit. There is, however, no competent evidence of such election; and this question may, therefore, be considered as out of the way.
Upon the facts disclosed by the pleadings and the proof in the case, the remaining consideration arises on this antenuptial contract. Does it bar the complainant’s right? It is insisted that it was procured by fraud; but, if not impeachable on this ground, that it is insufficient to bar a plain, statutory right to dower. In the opinion of this court, such agreements must be entered into bona fide, with a full knowledge of their consequences, and, under the circumstances, make reasonable provision for the wife, or courts of equity ought not to permit them to be set up as equitable estoppels.
What is the proof of fraud ? The instrument, it is said, and truly, bears on its face, as witnesses, the names of two of the decedent’s children, and was executed in the house of the deceased. It is not acknowledged. It is disclosed by the proof that Obed Folger, one of the witnesses, guided the hand of Mrs. Stilley *when she signed it, and that she can neither read nor write. It is also in evidence that she declared to others, either just before or soon after her husband’s death, that she was passive in the execution of this agreement, and ignorant of its effect. These are, substantially, the reasons relied upon to impeach this arrangement. They have been eloquently and ably dwelt upon by the complainant’s counsel; and it must be admitted that, without explanation, they are well calculated to awaken the suspicions of the chancellor, and perhaps lead him to doubt the fairness and integrity of this antenuptial agreement. If his suspicions -vyere not removed, he would doubtless hold his soliloquy in language identical with the counsel in the case at bar: “ What person so exposed to imposition as a woman, contracting, personally, with her intended husband, just on the eve of marriage, at a time when all prudential considerations are likely to be merged in a confiding attachment, or suppressed from an honorable instinct and sentiment of delicacy.” Surely, “ it would be a reproach to the law, if the very virtues and graces of woman were thus allowed to become the successful means of overreaching and defrauding them in bargains.”
*649 It must, nevertheless, be admitted, that the conscience of the chancellor, though touched with sentiment so delicate, would hardly stand excused, should investigation cease, relief bo decreed, and not even a glance cast nor a thought bestowed on the other side of this picture.
The evidence is clear that this lady had passed the age of middle life. She was doubtless forty or fifty, in very humble circumstances. She was, at the time of this arrangement, the tenant of Richard Folger, who charged her no rent, but furnished her with the means of subsistence. She had then been the wife of two husbands, the last of whom was an inmate in the City Hospital. Under these circumstances, she ingratiated herself into favor with Richard Folger, by her kindnesses and attentions to his two children, the witnesses to the agreement, for the period of about five months, when they died. Richard, *theu a widower of sixty or seventy winters, the evidence shows, assisted the complainant to procure a divorce from her husband, and then manned her himself. The divorce effected, these covenants were entered into, and the marriage consummated ; and, in looking, therefore, to the whole case, we have not been led to the conclusion that “prudential considerations were lost sight of in a confiding attachment.” No “honorable instinct of sentiment or delicacy,” is perceived by us in the transaction. It is undeniable that the marriage, on her part, was one of convenience only, and that it was effected by means cold and selfish. The cautious and guarded manner in which the rights of Mrs. Folger, as well as his, were secured by the marriage settlement, show, most unequivocally, that this lady understood well what she was doing and how to play her part. All supposed actual fraud may therefore be laid out of view.
Why, then, should not this agreement be enforced? Antenuptial contracts have long been regarded as within the policy of the law, both at Westminster and in the United States. They are in favor of marriage and tend to promote domestic happiness, by removing one of the frequent causes of'family disputes — contentions about property, and especially allowances to the wife. Indeed we think it may be considered as well settled, at this day, that almost any bona fide and reasonable agreement, made before marriage, to secure the wife in the enjoyment either of her own separate property, or *650 a portion of that of her husband, whether during the coverture or after his deattq will be carried into execution in a court of chancery. Though, for many purposes, by the marriage, the legal existence of the wife is merged in that of her husband, the law recognizes her legal and separate identity and her separate rights; and she may preserve the one and enforce the other, in contracts of this character.
It is said that courts of law are hampered by rigid rules, and that such agreements were never bars at law, unless they possessed the requisites of a jointure, under the statute of 27 Henry 8, c. 10. This is of little consequence to be determined in this case. *It is certain, however, the statute of uses was never in force in this state, and that courts of equity, here, derive no authority from its provisions, to set up those arguments in bar of dower. It is equally certain that they have repeatedly been enforced in the courts of our sister states, as equitable jointures, though they did not afford a competent livelihood of freehold for the wife, of lands and tenements, to take effect presently after the death of the husband. Lord Coke defines a jointure in 1 Ins. 36.
In New York, where the statute of uses has been copied and adopted, it has been held that any agreement between adults, for pecuniary provision, to be admitted, neither charged upon the lands of the husband nor to take effect immediately after his death, nor equal to the right of dower, in value, if reasonable, under all the circumstances, is a good, equitable jointure. Indeed, it is said, in one excellent work on real property, that, in equity, any provision which a woman accepts before marriage, in satisfaction of a dower,, as a trust estate, or a mere personal covenant for money to be paid by the husband, is a good jointure. 1 Hibbard’s Eeal Prop. 108.
Under our own statute, Swan, 198, sec. 2, though the terms of an antenuptial arrangement may not fall within the technical definition of a jointure, if consistent with the rules before laid down, no reason is preceived by us why it may not be viewed in chancery as a good equitable jointure. Or, in fact, why such court,, acting, not in obedience or analogy to any statute, but upon its own broad and inherent doctrine, should not regard such agreement as a complete equitable estoppel to the prosecution of such claim for dower.
It is said in this case the provision made for the wife is so much less than the value of one-third part of the husband’s lands, thaWt would be unreasonable to permit the agreement to operate as a bar. There is not, however, with the proofs, anything satisfactory to show the value of the real estate of the husband, or of which he died seized ; and, without such evidence, no such deduction can be legitimately drawn. On the whole case, we think the bill should be dismissed, with costs.